NATIONAL HOTEL ASSOCIATES, a New York Limited Partnership, by and through its general partner, M.E. VENTURE MANAGEMENT, INC.

v.

O. AHLBORG & SONS, INC., and Richard Ahlborg.

No. 2001–145–Appeal.

Supreme Court of Rhode Island.

July 1, 2003.

William Landry, Esq., Providence, for Plaintiff.

David Wollin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on April 9, 2003, on appeal by the

plaintiff, National Hotel Associates (NHA or plaintiff), from a judgment of the Superior Court denying and dismissing its complaint. The plaintiff is seeking to hold the defendants, O. Ahlborg & Sons, Inc. (O.Ahlborg)[1] and one of its principals, Richard Ahlborg (Richard), (collectively defendants), liable for a judgment confirming an arbitration award made in the plaintiff's favor against Construction Services, Inc. (CSI), an O. Ahlborg affiliated corporate entity.[2]

## Background

In 1983, NHA sought to renovate the National Hotel (the project), a large Victorian-style hotel overlooking Old Harbor on Block Island. Richard, aware that he was one of several contractors competing for the job, proposed that NHA use nonunion labor through an O. Ahlborg nonunion entity, CSI, to reduce the overall cost of the project. At that time, Richard, CSI's sole stockholder, assured NHA that he personally would rectify any problems that CSI experienced with the project. Barry Evans (Evans), one of NHA's principals, testified that Richard described CSI as a "Siamese twin" of O. Ahlborg's and that CSI operated out of the same offices and shared the same computer facilities, personnel, vehicles, and equipment. Evans further testified that Richard convinced him that NHA "should have no concern about the project being carried out by CSI" because both Richard and the entire O. Ahlborg organization "would back up CSI from start to middle to the end." The record also indicates that Richard repeatedly boasted that "he was CSI" and he

"was O. Ahlborg." When asked why he would deploy O. Ahlborg's resources to a project belonging to CSI a different company Richard responded, "Because I am both companies." Evans testified that in the face of these promises and Richard's many representations, NHA entered into a contract with CSI. According to Evans, "[n]o distinction was drawn whatsoever by [Richard] * * * between the two companies."

The renovation work on the National Hotel began in the fall of 1983, but by early December, CSI's cash flow problems led to construction delays. Consequently, O. Ahlborg extended a $400,000 line of credit to the struggling corporation. Later, when CSI's inability to perform further delayed construction, Richard and O. Ahlborg assumed control over the project; CSI's construction manager was fired and was replaced by an O. Ahlborg project manager. The evidence submitted at trial demonstrated that despite its undercapitalization, CSI continued operations with the financial backing of O. Ahlborg. However, CSI never reimbursed O. Ahlborg for the $400,000 cash infusion.[3] In total, approximately $360,000 of the $400,000 advanced by O. Ahlborg was directly attributable to the project. Richard openly admitted that without O. Ahlborg's financial assistance, CSI would have been unable to proceed with the construction. Anthony D. Lee, a certified public accountant specializing in the construction industry, reviewed CSI's financial operating history, work in progress and cash flow requirements and testified that CSI was undercapitalized during

---

1. O. Ahlborg was formed in 1926 to serve as a general construction company.

2. CSI was formed in 1981 when it filed its original incorporation documents with the Secretary of State.

3. It is undisputed that CSI was unable to borrow money on its own, and the only time CSI applied for a loan it was rejected by Citizen's Bank on the grounds that the entity was undercapitalized. The record discloses that CSI forwarded the invoices that were incurred during the construction project directly to O. Ahlborg.

each year from 1982 through 1986 and was, at all relevant times since its inception in 1981, insolvent.

In 1984, CSI commenced arbitration proceedings against NHA in an effort to collect approximately $500,000 on O. Ahlborg's behalf. This claim centered on defendants' contention that NHA owed money for work performed on the project. Richard later admitted that he and O. Ahlborg were the real parties in interest in this arbitration. The evidence disclosed that O. Ahlborg financed the entire arbitration proceeding, including costs for expert witnesses and attorneys' fees.[4]

NHA counterclaimed and sought recovery for CSI's nonconforming, defective and untimely performance of the work. On May 7, 1986, at the close of arbitration, the arbitration panel awarded NHA $230,687.20 in damages based upon construction delays and defective work and denied all claims asserted by CSI. On June 19, 1986, a judgment confirming the arbitration award was entered in the Superior Court, and on September 3, 1986, an execution was returned unsatisfied. NHA thereafter filed this action against O. Ahlborg and Richard, seeking to impose liability on both defendants for the full amount of the judgment. An examination of the pre- and post-award conduct of defendants amply demonstrates why plaintiff was unable to collect its judgment.

**Defendants' Post–Arbitration Behavior**

According to NHA, almost immediately after the arbitration award was rendered, Richard and O. Ahlborg began a course of conduct designed to prevent NHA from collecting its judgment. Within two weeks of the award, defendants' arbitration and litigation counsel (trial counsel) formed Critical Path Construction Company (CPC). This new corporation obviously was established to shield CSI's assets from the reach of its creditors by secretly, and indeed fraudulently, transferring those assets to CPC. CPC's president was arbitration counsel's secretary and its corporate address was arbitration counsel's office. Richard was the majority stockholder and self-appointed treasurer of CPC. Edward Abbenante, the president of CSI, was named president of CPC. He testified that Arnold Kilberg & Co., certified public accountants, prepared balance sheets on CSI's contracts in progress and assisted in transferring those contracts to CPC. Before the arbitration award, CSI was housed in a building that Richard and his wife, Carol, personally owned and rent was paid directly to Richard. Immediately after the award, CPC set up shop in this same office and proceeded to discharge the identical functions that CSI, as an O. Ahlborg affiliated corporate entity, once performed.

At the time the arbitration award was made, CSI was involved in six major projects, and all of these contracts were transferred to CPC. Additionally, plaintiff demonstrated that after the arbitration award, CSI simply bought a rubber stamp bearing the name "Critical Path Construction Co." and amended all correspondence and other documents to Critical Path Construction Co. CSI's vendors and subcontractors were directed, in future correspondence, to change all references from CSI to CPC. At trial, NHA presented expert testimony that as of the end of 1985, the last year-end period before the arbitration award, CSI's books showed an estimated $1.6 million in anticipated revenues from these contracts. The plaintiff demonstrated that $920,573 in cash passed through CPC from

---

4. At the subsequent trial in the Superior Court, Richard testified that "if it were not for O. Ahlborg & Sons [there] would have been no arbitration claim by CSI."

CSI's unfinished projects between the date of the award and 1988, when CPC became insolvent.

### Concealment of CPC's Existence and Fraudulent Transfers

According to plaintiff, in order to insulate CSI's assets and prevent an execution by NHA, defendants began to divert cash flow and construction contracts from CSI to CPC. Despite plaintiff's repeated and comprehensive discovery requests, including deposition notices and a subpoena *duces tecum,* documents revealing defendants' perfidy were not produced, allowing CPC's very existence and its fraudulent transfer of CSI's assets to be concealed from its judgment creditor. The record discloses that this information was not divulged during hearings on defendants' motions for summary judgment. Consequently, as a result of the non-disclosure of these discoverable documents, NHA alleged that it unwittingly stipulated to summary judgment on its claim for breach of fiduciary duty. It was only after new counsel entered his appearance and prepared for trial (new counsel), that the existence of these documents and CPC's sordid genesis came to light. New counsel, to his credit and consistent with his responsibilities as an attorney, produced the documents that established this nefarious scheme.

In addition to the fraudulent transfers of CSI's assets, the evidence disclosed that in April 1986, immediately before the award was issued, Richard engineered a repayment by CSI of a $50,000 loan to Mayfield Associates, an entity that he partly owned. In addition, days after the arbitration award, Richard directed that CSI repay $20,000 that he personally had borrowed

from Citizens Bank to keep CSI afloat. Lastly, although insolvent, CSI, succeeded by CPC, consistently paid rent to Richard for space occupied by these corporations.

The plaintiff's complaint initially consisted of three distinct claims. Count 1 alleged that CSI's corporate entity should be disregarded and defendants should be declared liable for its judgment debt because CSI was operated as a conduit or instrumentality of O. Ahlborg and was inadequately capitalized.[5] Additionally, plaintiff argued that by stepping in and completing the contract as it had warranted, O. Ahlborg substituted itself for CSI and was a continuation of CSI and therefore should assume CSI's debts.

In count 2, NHA argued that Richard had guaranteed CSI's performance and promised that if it became necessary, O. Ahlborg would complete the project. Thus, when O. Ahlborg supplied "personnel, materials, and funds to CSI in connection with the renovation" work, it became CSI's guarantor and therefore was responsible for its debts. The trial justice denied this claim. However, because of our decision vacating the judgment on count 1 against O. Ahlborg, count 3 against Richard, and count 4 against both defendants, we need not address this issue.

With regard to count 3, NHA alleged that the transfer of CSI's assets to CPC and CSI's payments to Richard's creditors while it was insolvent constituted a breach of fiduciary duty to CSI's creditors and amounted to improper insider preferences. However, uninformed about CPC and the transfer of CSI's assets, plaintiff stipulated to the entry of summary judgment on count 3, but subsequently argued to the trial justice and again to this Court, that

---

5.  We note that summary judgment on count 1 in favor of Richard was entered on May 12, 1995. The plaintiff has not appealed from

that decision and we decline to address it herein.

summary judgment should be vacated because this stipulation was reached before the incriminating documents were disclosed. NHA contended that had this evidence been produced, as it should have been, it was sufficient to overcome a motion for summary judgment. The trial justice denied NHA's motion to vacate the judgment.

Finally, as a result of the production by trial counsel, nine years after the initial demand, of previously suppressed and incriminating evidence relative to the creation of CPC and its devastating impact on CSI's financial life, NHA successfully moved to amend its complaint to include a claim for a violation of G.L.1956 chapter 16 of title 6, the Uniform Fraudulent Transfer Act. Although the trial justice permitted plaintiff to amend its complaint and allege fraudulent transfers by CSI, Richard and O. Ahlborg, she ultimately denied and dismissed this claim.

At trial, NHA attempted to persuade the trial justice that both Richard and O. Ahlborg should be held jointly and severally liable for the judgment because CSI was a sham entity and a mere instrumentality of O. Ahlborg, and that fraudulent transfers and deceptive dealings occurred between and among the defendants and their companies, designed to frustrate NHA's efforts to collect its judgment. More specifically, NHA attempted to prove that defendants engaged in inequitable conduct throughout the construction, the arbitration, and in post-arbitration proceedings as NHA sought satisfaction of its judgment. NHA also presented evidence that CPC was created for the sole purpose of moving CSI's assets out of reach of its creditors, and that trial counsel unfairly had suppressed and withheld this evidence.

After considering the arguments of counsel, the trial justice found that there was no basis for disregarding CSI's corporate entity or finding that defendants should be liable for CSI's judgment debt on any other ground. With respect to the issue of fraudulent conveyances, the trial justice concluded that the creation of CPC and the dissolution of CSI were irrelevant to whether defendants, as directors of CSI, owed a fiduciary duty to its creditors. The trial justice entered judgment in favor of defendants, and NHA timely appealed.

## Issues

The plaintiff has raised several issues for our consideration; however, we shall address only those issues that are relevant to our decision. First, NHA contends that in rejecting its claim that CSI was a mere instrumentality or continuation of O. Ahlborg, the trial justice misconceived or overlooked material evidence and was otherwise clearly wrong. The plaintiff also assigns as error her refusal to vacate partial summary judgment on count 3, the claim of breach of fiduciary duty. NHA argues that the trial justice committed reversible error in finding that a director of an insolvent corporation has no fiduciary duty to its creditors and that her conclusion that evidence of CSI's fraudulent transfers to avoid its judgment creditor was irrelevant also was error.

## Standard of Review

■ The findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed on appeal unless he or she has misconceived or overlooked material evidence, was clearly wrong, or the decision fails to do substantial justice between the parties. *Macera v. Cerra*, 789 A.2d 890, 892–93 (R.I.2002).

■ "Motions to vacate a judgment are addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a showing of abuse of discretion." *Medeiros v. Anthem Casual-*

*ty Insurance Group*, 822 A.2d 175, 178 (R.I.2003) (quoting *Gray v. Stillman White Co.*, 522 A.2d 737, 741 (R.I.1987)). In passing on a Super.R.Civ.P. 60(b)(2) motion to vacate or modify a judgment based on newly discovered evidence, the trial justice applies the same standard applicable to a Super.R.Civ.P. 59 motion for a new trial. *Corrente v. Town of Coventry*, 116 R.I. 145, 147, 352 A.2d 654, 655–56 (1976). When the new evidence is material and controlling, such that it likely would have changed the outcome of the case and was not, by the exercise of due diligence, discoverable at the time of the hearing, the motion should be granted. *Id.* The trial justice's denial of a Rule 60 motion to vacate or modify a judgment may be reversed on appeal upon a showing of abuse of discretion or other error of law. *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I.2001) (citing *Iddings v. McBurney*, 657 A.2d 550, 553 (R.I.1995)).

### CSI as a Mere Instrumentality or Mere Continuation of O. Ahlborg

■ In rejecting the claim that CSI's corporate entity should be disregarded and that O. Ahlborg should be liable for its debt because CSI was operated as a mere conduit or instrumentality of O. Ahlborg, the trial justice correctly observed that if two corporations are affiliated through common stock ownership, each will be considered a separate and independent entity "unless the totality of the circumstances surrounding their relationship indicates that one of the corporations 'is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of [the other].'" *Vucci v. Meyers Brothers Parking System, Inc.*, 494 A.2d 530, 536 (R.I.1985) (quoting *United Transit Co. v. Nunes*, 99 R.I. 501, 508–09, 209 A.2d 215, 219 (1965)). The criteria for piercing the corporate veil to impose liability on non-

corporate defendants vary with the particular circumstances of each case. *Doe v. Gelineau*, 732 A.2d 43, 48 (R.I.1999). However, "when the facts of a particular case render it unjust and inequitable to consider the subject corporation a separate entity" we will not hesitate to disregard the corporate form and treat the defendant as an individual who is personally liable for the debts of the disregarded corporation. *R & B Electric Co. v. Amco Construction Co.*, 471 A.2d 1351, 1354 (R.I.1984). Thus, in circumstances in which there is such a unity of interest and ownership between the corporation and its owner or parent corporation such that their separate identities and personalities no longer exist we have held that "[a]dherence to the principle of their separate existence would, under the circumstances, result in injustice." *Muirhead v. Fairlawn Enterprise, Inc.*, 72 R.I. 163, 172–73, 48 A.2d 414, 419 (1946). In those situations the corporate form is disregarded and liability is determined by justice and fairness.

■ In evaluating the degree of separateness between two corporations, we look to the totality of the circumstances and examine such factors as stock ownership, capitalization, dual office holding and directorships, financial support or dependence, a lack of substantial business contracts independent from the other corporation and a domination of finances, policies and practices. *Vucci*, 494 A.2d at 535. Having reviewed the evidence in the record in this case, this Court is of the opinion that a finding that CSI was operated as an instrumentality of O. Ahlborg is amply demonstrated and that liability for CSI's judgment debt should rest with O. Ahlborg.

Although the trial justice found that O. Ahlborg shared employees with CSI during the project and that O. Ahlborg en-

abled CSI to continue the project by advancing substantial sums, she concluded that "the evidence on the whole record mitigates against a finding of dominant control of CSI by O. Ahlborg." She concluded that CSI was created to manage small-scale construction projects, a function that was different from the work performed by O. Ahlborg. She further found that CSI's articles of incorporation, annual reports and tax returns were maintained separately, as were its financial records and bank accounts, and that there was no commingling of assets by the two entities. Although acknowledging Richard's frequent proclamations that he was "both companies," the trial justice rejected the contention that CSI was so controlled by O. Ahlborg as to render it "an instrumentality, agency, conduit, or adjunct" of defendant.

Next, the trial justice rejected plaintiff's argument that O. Ahlborg, as CSI's parent corporation, should be liable for CSI's debts. Concluding that the corporate form of business should be observed, " '[a]bsent a showing of inequity, fraud, undercapitalization, or domination by the parent corporation,' " *Miller v. Dixon Industries Corp.*, 513 A.2d 597, 604 (R.I. 1986), the trial justice found that CSI was incorporated for a legitimate business purpose and, at the time of its inception, it was adequately capitalized.

■ We are satisfied that the trial justice erred in finding that there was no basis to impose liability for CSI's debts upon O. Ahlborg, its parent corporation, and further, her conclusion that CSI was not operated as a mere conduit or instrumentality of O. Ahlborg was also erroneous. The evidence disclosed that although defendants scrupulously adhered to the usual corporate formalities, thus endeavoring to preserve the corporate protections afforded by law, CSI wound up an empty shell, unable to pay this judgment because its assets were dissipated for the benefit of Richard and O. Ahlborg. Accordingly, we are of the opinion that CSI was dominated and controlled by Richard as an alter ego of O. Ahlborg, all to the detriment of NHA, its victim and judgment creditor.

In her decision, the trial justice failed to consider the totality of the evidentiary circumstances that support a finding that O. Ahlborg is responsible for the corporate debt of CSI. The evidence that Richard Ahlborg dominated the affairs of each entity was overwhelming; not only did he declare, whenever it was expedient to do so, that he *was* CSI and he *was* O. Ahlborg, he unhesitatingly deployed the resources of one corporation in favor of the other whenever the circumstances warranted, including steering NHA to CSI, financing the undercapitalized CSI, completing its contract with NHA, and attempting to collect CSI's indebtedness on O. Ahlborg's behalf by financing a meritless arbitration followed by a clandestine war of hide the assets.

We are satisfied that the trial justice erroneously limited her analysis to the period of CSI's inception and based her refusal to pierce the corporate veil in large part on CSI's allegiance to the corporate formalities. The trial justice overlooked the defendants' conduct during the relevant time period, when Richard the sole stockholder of CSI and president and sole stockholder of O. Ahlborg was operating both entities as his personal fiefdoms. The trial justice concluded that CSI was incorporated to engage in and "in fact, did engage in a business [that was] different from O. Ahlborg," the performance of smallscale projects. However, the evidence established that with respect to *this* project, and at other critical points in CSI's history, Richard dominated the affairs of all three entities—CSI, O. Ahlborg

and CPC—to an extraordinary degree. The plaintiff testified that Richard made sweeping representations that CSI was a nonunion arm of O. Ahlborg that could perform the work at a cheaper price but, if it became necessary, the project would be completed by O. Ahlborg with O. Ahlborg's resources. We are satisfied that the trial justice misconceived the import of this evidence. CSI, as alleged by plaintiff, was wholly owned by Richard and operated as an alter ego of O. Ahlborg, the larger, more established corporation.

The plaintiff presented evidence, through Evans, that Richard described CSI as a "Siamese twin" of O. Ahlborg, that "CSI was O. Ahlborg," and he promised NHA that O. Ahlborg would complete the project if CSI was unable to do so. We conclude that these personal promises, although found by the trial justice to be unenforceable as a promise to pay the debt of another,[6] are relevant factors in deciding whether the corporate form should be disregarded. It is undisputed that Richard promised to complete the project with O. Ahlborg's resources if it became necessary and honored that promise when CSI stumbled. In this circumstance, as plaintiff argued, O. Ahlborg ignored the corporate distinctions and disregarded CSI's corporate separateness at every stage: during the bidding and negotiations; with respect to the financing, when it "loaned" CSI $400,000 to remain afloat; during construction when O. Ahlborg's employees, equipment and expertise were employed to complete the work, and finally, during the arbitration, by bankrolling a proceeding that clearly was intended to recoup O. Ahlborg's cash disbursements to CSI.

We are not persuaded that O. Ahlborg's allegiance to separate corporate records and accounts shields it from liability. As plaintiff has alleged, this is really corporate "bells and whistles" designed as a smokescreen for unfair manipulation of the corporate enterprise in furtherance of defendants' interests. *See Tigrett v. Pointer*, 580 S.W.2d 375, 384–85 (Tex.Civ.App.1978) (dominant stockholder who drained assets of corporation to avoid creditors, set up new entities and made preferential payments may not hide behind corporate formalities to avoid personal liability).

Additionally, the evidence that CSI was undercapitalized from its inception and was insolvent for this entire period, including when it was retained by NHA, was overlooked by the trial justice, who focused her analysis on CSI's initial capitalization and found that CSI adequately was capitalized at its inception. However, plaintiff presented evidence that without the infusion of $400,000 in cash from O. Ahlborg, CSI's very existence was threatened. According to Lee, plaintiff's expert witness in construction financing, a construction company's volume of business and its monthly obligations are important factors in determining adequate capitalization for continued operations. Lee testified that a firm engaged in the volume of business CSI conducted, with CSI's overhead and income, required $300,000 in reachable equity to continue to function. The trial justice overlooked this evidence and focused her analysis on the $1,000 initial capital investment in CSI upon its incorporation. We deem this to be error. The evidence disclosed that CSI was unable to qualify for a $20,000 bank loan and that Richard was forced to personally bor-

---

6. General Laws 1956 § 9–1–4 provides in pertinent part:
   "**Statute of frauds.**—No action shall be brought: * * * (4) Whereby to charge any person upon his or her special promise to answer for the debt, default, or miscarriage of another person[.]"

row even more money to keep CSI afloat. Richard's indebtedness was repaid by CSI, at his direction, after the arbitration award was issued. Further, no effort was made to collect CSI's $400,000 indebtedness to O. Ahlborg, either before or after CSI's assets were transferred to CPC. This evidence demonstrates undercapitalization and is damning proof that CSI was operated as a shell corporation for defendants' benefit. *See Vucci,* 494 A.2d at 535 (inadequate capitalization and domination of corporate finances are pertinent factors in deciding whether a corporate form should be disregarded).

Thus, as Richard so often proclaimed, at least for financial operations, O. Ahlborg was CSI. Accordingly, the corporate form that otherwise would shield O. Ahlborg from liability is unavailing and O. Ahlborg is liable for CSI's judgment debt.

### Breach of Fiduciary Duty

As noted, the trial justice denied plaintiff's motion to vacate partial summary judgment in favor of Richard on the claim for breach of fiduciary duty to CSI's creditors. Although she permitted plaintiff to amend its complaint to add a count alleging a breach of the Uniform Fraudulent

Transfer Act (act),[7] the trial justice concluded that NHA was not seeking a remedy under the act because it was not seeking to recover the value of the transferred assets. Rather, she concluded, plaintiff pointed to the fraudulent transfers as evidence of Richard's breach of fiduciary duty, the claim she declined to reinstate.

▇▇▇▇ In considering a motion for relief from judgment based on newly discovered evidence, the trial justice must look to the standards set forth in Rule 59. A new trial based on newly discovered evidence may be granted if the trial justice, after carefully reviewing and evaluating the proffered evidence is satisfied that it was "not previously known or discoverable in the exercise of reasonable diligence, [and] is of sufficient importance to warrant a new trial of the action." *Hilton v. Fraioli,* 763 A.2d 599, 603 (R.I.2000) (per curiam) (quoting *Finkelstein v. Finkelstein,* 502 A.2d 350, 356 (R.I.1985)). Newly discovered evidence is evidence that was not, by the exercise of reasonable diligence, discoverable for use at trial. *See Malinowski v. United Parcel Service, Inc.,* 792 A.2d 50, 56 (R.I.2002). Further, the evidence must be probative and persuasive, such that it would probably change the outcome of the

7. General Laws 1956 § 6–14–4 provides in relevant part:

"**Transfers fraudulent as to present and future creditors.**—(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]"

Section 6–16–5 provides in pertinent part:

"**Transfers fraudulent as to present creditors.**—

" * * *

"(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer

was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."

"Section 6–16–7 provides in pertinent part:

"**Remedies of creditors.**—(a) In an action for relief against a transfer or obligation under this chapter, a creditor * * * may obtain:

"(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

" * * *

"(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

" * * *

"(iii) Any other relief the circumstances may require."

case if it had been introduced at trial. *Corrente*, 116 R.I. at 147, 352 A.2d at 655.

Upon finally gaining access to the documentary evidence of defendants' nefarious scheme to move CSI's assets out of plaintiff's reach, NHA sought to vacate the judgment on count 3, a claim for breach of fiduciary duty. The plaintiff argued that judgment in favor of Richard should be vacated based on the plethora of newly discovered evidence of fraudulent transfers of CSI's assets. The trial justice concluded that there was no basis for vacating the judgment because "the evidence of the transfers from CSI [to CPC had] * * * no effect on the alleged preferential payments that Richard Ahlborg made prior to the arbitration award." The trial justice based this ruling on her conclusion that the directors of a corporation are trustees for the stockholders until the corporation becomes insolvent. Although the trial justice determined that the arbitration award rendered CSI insolvent, "[t]here remained for the stockholders, however, a substantial interest in the property of the corporation, namely the six contracts that were in various stages of completion." According to the trial justice, "each [stockholder] shared a financial interest in seeing the corporation continue its business in the ordinary course" and Richard, as a director, was a trustee for the remaining stockholders and owed a duty to ensure that the contracts were completed. The trial justice concluded that Richard did not owe a fiduciary duty to CSI's creditors. We disagree with this conclusion.

First, we are satisfied that Richard was guilty of making fraudulent transfers of CSI's assets and preferential payments to its creditors in a transparent effort to avoid this judgment and in breach of his fiduciary duty to CSI's creditors. The evidence disclosed that Richard caused certain indebtedness of CSI to be repaid to

his financial advantage. He directed the payment of a loan to Mayfield Associates, an entity in which he held an interest, and he directed that CSI repay a $20,000 bank loan for which he was personally liable.

This Court has never absolved directors and officers of an insolvent corporation from their fiduciary duty to its creditors. "When a corporation becomes insolvent and can no longer continue in business, the directors and other managing officers occupy a fiduciary relation towards creditors by reason of their position and their custody of the assets." 15A Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7469 at 227–28 (perm. ed.2000). Therefore, directors and officers may not, "by conveyance, mortgage, pledge, confession of judgment, or otherwise secure to themselves any preference or advantage over other creditors." *Id.* at 228. With respect to a director's obligations when a corporation becomes insolvent, this Court previously has recognized the trust fund doctrine, and held that the assets of an insolvent corporation are "a trust fund for the benefit of the corporation's creditors." 15A Fletcher, § 7369 at 48–49; *see also DiPrete v. Vallone*, 72 R.I. 137, 141, 48 A.2d 250, 252 (1946) (the assets of a corporation, upon dissolution, constitute a trust fund for the benefit of its creditors and stockholders). Just as the assets of a dissolved corporation constitute a trust fund for the benefit of its creditors, it is inequitable to allow directors who control the affairs of the corporation to act in such a way that corporate insolvency is inevitable or to place themselves in a favorable position by protecting their own interests to the detriment of the remaining creditors. *See* 15A Fletcher, § 7469 at 232. In arguing a contrary position, defendants urge the minority rule that an insolvent corporation may prefer one creditor over another creditor, even if he or she is an officer of the corporation. *See* 19 C.J.S. *Corpora-*

*tions* § 753 (1990); *see Sanford Fork & Tool Co. v. Howe, Brown & Co.,* 157 U.S. 312, 318–20, 15 S.Ct. 621, 623–24, 39 L.Ed. 713, 716–17 (1895). This rule has been subject to criticism and we reject defendants' suggestion; we decline to adopt a rule that would permit insider preferences with respect to an insolvent corporation. *See* 15A Fletcher, § 7469. In *Olney v. The Conanicut Land Co.,* 16 R.I. 597, 599, 18 A. 181, 181 (1889), this Court recognized an identifiable fiduciary relationship between a creditor and a debtor:

> "[W]hen the corporation becomes insolvent and the stockholders have no longer a substantial interest in the property of the corporation, [then the] directors should be regarded as trustees of the creditors to whom the property of the corporation must go."

Thus, whether a corporation is insolvent or facing a potential judgment that would render it insolvent, the directors are fiduciaries of the creditors and may not engage in preferential treatment for themselves or otherwise abandon their fiduciary responsibilities.

■ We therefore are satisfied that the trial justice erred in refusing to vacate summary judgment based on newly discovered evidence. We deem this evidence to be both newly discovered and of sufficient materiality to have changed the outcome. *Corrente,* 116 R.I. at 147, 352 A.2d at 656. Evidence that was deliberately suppressed in violation of the Rules of Civil Procedure and Article V of the Supreme Court Rules of Professional Conduct certainly meets the test of newly discovered evidence; no amount of due diligence can overcome trial counsel's intentional misconduct during the discovery process. Moreover, the probative value of documentary evidence of fraudulent transfers in violation of a director's fiduciary duty cannot be over-

stated. This is explosive proof of defendants' intent to avoid payment of plaintiff's judgment and unquestionably establishes the entire iniquitous scheme. Therefore, the trial justice should have reinstated NHA's claim against Richard for breach of fiduciary duty and entered judgment for plaintiff.

We are satisfied that Richard, knowing full well that CSI was in danger of an adverse and substantial arbitration award, engaged in fraudulent and inequitable behavior amounting to preferential treatment and insider dealing in breach of his fiduciary duty as a director of CSI. He directed the repayment of CSI's indebtedness to benefit himself and engaged in a secret scheme, concocted by trial counsel, to form a new corporation to divest CSI of its remaining assets and avoid NHA's judgment. Richard therefore is liable for his behavior.

### Fraudulent Transfers

■ Finally, the evidence established that Richard, bankrolled by O. Ahlborg, and with the assistance of his trial counsel, caused CSI to make fraudulent transfers to CPC and preferential debt payments for his personal benefit. This conduct violates the Uniform Fraudulent Transfer Act. We note that the trial justice denied this claim on the ground that NHA was not seeking an accounting or the value of the transferred contracts. However, relief other than the value of the fraudulent transfers and payments is available pursuant to § 6–16–7(a)(3)(iii), which provides that in an action for relief against a fraudulent transfer, a creditor may obtain "[a]ny other relief the circumstances may require." We are satisfied that this section is broad enough to include the imposition of personal liability on both defendants for this misconduct and to order relief in the amount of plaintiff's judgment. *See Nisenzon v.*

*Sadowski,* 689 A.2d 1037, 1044 (R.I.1997) (damage award in the amount of the claim against the debtor rather than the value of the asset that was fraudulently transferred was neither clearly erroneous nor inequitable). The decision of the trial justice denying and dismissing this claim therefore was erroneous and judgment for the plaintiff should have been entered against both defendants for violations of the Uniform Fraudulent Transfer Act.

### Conclusion

For the reasons set forth herein, the plaintiff's appeal is sustained and the judgment is vacated. The papers in this case may be remanded to the Superior Court with directions to enter judgment in favor of the plaintiff, National Hotel Associates, ordering that the defendants, O. Ahlborg & Sons, Inc. and Richard Ahlborg, are jointly and severally liable for the judgment debt of CSI, plus interest and costs as follows: on count 1, the claim that CSI's corporate status be disregarded, judgment shall enter against the defendant, O. Ahlborg & Sons, Inc.; on count 3, the claim of breach of fiduciary duty, judgment shall enter against the defendant, Richard Ahlborg, and on count 4, violation of the Uniform Fraudulent Transfer Act, judgment shall enter against both the defendants.

Justice FLAHERTY did not participate.