[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court pursuant to Rhode Island Rules of Civil Procedure Rule 56 is Defendants' Motion for Summary Judgment. Defendants move for summary judgment on Count II, Fraud in the Inducement against James S. Gordon (Gordon) and Mitchell H. Jacobs (Jacobs) individually; Count III, Fraud in the Inducement against Energy Management Inc. (EMI); Count IV, Fraudulent Transfer against EMI and EMI Grace Park Hotel, LLC (EMIG); and Count V, Breach of Contract against EMI. Plaintiff Stanley Weiss Associates, LLC (SWA) has filed a timely objection to the motion.
 Facts and Travel
This case involves the lease of three buildings — the Liner, Lederer and Bell Hall Buildings — located in downtown Providence and owned by SWA, whose sole member is Stanley Weiss (Weiss). Some time in December of 2000, Weiss was contacted by Gordon, President of Defendant EMI; a meeting was scheduled for December 19, 2001 for more formal introductions. (Gordon Dep. at 73-74) (See also, Weiss Dep. at 113).
At this initial meeting, Gordon and Weiss exchanged stories regarding their business ventures and family lives. (Gordon Dep. at 73-74). Weiss spoke of his agreement with a group of investors, collectively known as the Rubin Group, to develop the buildings central to this dispute as a hotel. Id. at 75. The Rubin Group, however, was encountering numerous obstacles in its effort to secure financing. Id. Weiss explained that in the event that these investors failed to obtain financing for the project, he would pursue other avenues in order to develop these buildings. Id.
During this meeting, Gordon discussed his business holdings in Rhode Island Id. at 75-76. He indicated that he had recently purchased property in Providence, located at 400 Westminster Street, and that he was interested in further investing in Providence real estate. Id. Gordon and Weiss also discussed certain power plant projects which Gordon had developed and recently sold. Id. at 76-78. Prior to mentioning his involvement with these projects, Gordon sensed that Weiss was familiar with the power plant projects and Gordon's involvement therewith. Id. at 76.
Gordon and Weiss met for the second time in January or February of 2001. Id. at 88-90. The conversations were similar to those of the first meeting; however, in this meeting Gordon claims that he spoke specifically to the financial structure of his limited liability companies. Id. Gordon explained to Weiss that he established "stand-alone limited partnerships" for each project, including the power plants, financed in each instance by "non-recourse project financing." Id. at 88.
Some time later, Jacobs, Treasurer of EMI, contacted Weiss, and they agreed to meet at Weiss's office. (Jacobs Dep. at 58). At this meeting, Jacobs expressed interest in investing in the hotel project; Weiss, however, explained his involvement at that time with the Rubin Group. Id. at 61. Jacobs told Weiss to contact him in the event that the Rubin agreement fell through. Id. at 61. Shortly thereafter, Weiss contacted Jacobs; as predicted, the Rubin Group was unable to obtain financing, thereby failing to meet its obligation under the agreement. (Jacobs Dep. at 66). SWA began seeking other investors for the hotel project. Id. Jacobs contacted Weiss and scheduled an onsite meeting to discuss his interest in developing the property; Gordon was also to attend.Id. at 66.
At the meeting, Gordon and Jacobs toured the Lederer building and were shown the building's architectural plans. Id. at 71. They discussed the hotel projects' continued progress and also those portions which remained unfinished. Id. at 76. A few weeks passed, and Jacobs inquired of Weiss as to the possibility of purchasing the property; however, Weiss refused to sell, preferring instead to derive continual income from the property.Id. at 84. In response, Jacobs suggested a long-term lease agreement. Id. Jacobs could not recall if financing was discussed at that time. Id. at 72-78.
By letter on EMI letterhead dated April 2, 2001, Jacobs wrote to Weiss the following: "we are interested in leasing your property on Westminster Street for the purpose of constructing and operating a hotel." (Plaintiff's Exhibit 6). On April 12, 2001, Gordon mailed a proposed letter of intent to Weiss, again on EMI letterhead, which reads ". . . agreed to between Seller and Energy Management, Inc." (Plaintiff's Exhibit 8). Two significant changes occurred on April 13, 2001. The proposed terms were confirmed in writing by Jacobs, however, in this letter, Jacobs designated the lessee as EMI Grace Park Hotel, LLC (EMIG); further, the letter was written on EMIG letterhead. (Plaintiff's Exhibit 9). Weiss and Gordon both signed an agreement on April 20, 2001. (Plaintiff's Exhibit 10) (Seealso, Gordon Dep. at 122-123). In this agreement, each party was obligated to negotiate the terms of a lease in good faith for 30 days and EMIG was provided a 60-day due diligence period.Id.
A project management services agreement was entered into between EMI and EMIG. (Plaintiff's Exhibit 24). This agreement granted EMI the right to manage the operations and finances of EMIG; for its services, "EMI will receive a monthly fee in an amount equal to the actual out-of-pocket expenses incurred by EMI . . . including the cost of salaries, payroll benefits and overhead" until the completion of the project. Id. Purportedly acting pursuant thereto, EMI entered into agreements with numerous companies to determine the viability of the hotel project during the due diligence period. Specifically, EMI engaged Environmental Science Services, Inc. to conduct various environmental inspections. (Plaintiff's Exhibit 37). Also, Newport Collaborative Architects was asked to develop the architectural and engineering plans for the hotel project, and it submitted its proposal to EMI. (Plaintiff's Exhibit 38). Checks drawn against accounts in the name of EMI Grace Park Hotel, LLC were paid to these companies for services rendered. (Plaintiff's Exhibit 41).
On April 20, 2001, Weiss and Gordon signed a non-binding letter proposing the terms of a lease between the parties. (Plaintiff's Exhibit 10). The formalization of the proposed letter of intent into a lease agreement was subject to extensive negotiations. (Weiss Dep. at 157). At some point during these negotiations, Weiss's attorneys informed him that he would be entering into the agreement with a limited liability company "with no guarantees." (Weiss Dep. at 147). Weiss admits recognizing the legal implications of dealing with an LLC, understanding that liability is limited to the assets of the company alone. (Weiss Dep. at 146-148). Ultimately, the lease terms were finalized and signed by Weiss and Gordon on May 10, 2001; the designated tenant was EMI Grace Park Hotel, LLC. (Plaintiff's Exhibit 20). On June 18, 2001, following the due diligence period, Gordon wrote on EMIG letterhead "that EMIG [had] determined to proceed with the Project . . . [and that they were] looking forward to making our vision for Grace Park Hotel become a reality." (Plaintiff's Exhibit 31). Officially, the lease commenced on November 9, 2001. (Plaintiff's Exhibit 20).
EMIG made three rental payments to SWA. (Jacobs Dep. at 267). The first was by check issued by EMIG on November 11, 2001, in the amount of $5,275.56, a prorated amount. (Plaintiff's Exhibit 35) (See also, Jacobs Dep. at 318). The second payment was issued by EMIG on November 27, 2001, in the amount of $10,000, a full month's rent. Id. And the third and final payment was issued by EMIG on December 27, 2001, again in the amount of $10,000. Id. EMIG failed to make their fourth payment, due on February 1, 2002. (Plaintiff's Exhibit 20). Several days prior to that date, in fact, on January 24, 2002, EMIG issued three checks totaling $30,000 payable to EMI.
 Standard of Review
"Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v. Burrillville Racing Association,603 A.2d 317, 320 (R.I. 1992) (citing Steinberg v. State,427 A.2d 338 (R.I. 1981); Ludwig v. Kowal, 419 A.2d 297 (R.I. 1980)); Super. Ct. R. Civ. P. Rule 56(c). In deciding a summary judgment motion "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Id. (citing Lennon v. MacGregor, 423 A.2d 820
(R.I. 1980)). Moreover, "the trial justice must look for factual issues, not determine them. The justice's only function is to determine whether there are any issues involving material facts."Id. (quoting Steinberg v. State, supra at 340).
 Fraud in the Inducement
Defendants maintain that they made no oral assurances as to the financial backing of the Hotel project upon which Plaintiff could reasonably rely. Defendants base their argument on the fact that SWA, headed by a sophisticated businessman, Weiss, was aware that the tenant under the agreement was a limited liability company and that there were no guarantors of the lease. In further support of their position, Plaintiffs assert that Weiss, by his own admission, knew of the implications of dealing with a limited liability company and, therefore, could not reasonably rely upon the alleged assertions of either Defendant. Weiss, however, contends that he entered into the agreement with Defendants because of numerous assurances that Defendants would fund the hotel project with the profits from the sale of certain energy plants, evinced by the fact that a financing contingency was not included in the lease agreement. Furthermore, Weiss maintains that Defendants led him to believe that the use of the LLC form of business organization was simply a prophylactic measure to limit potential claims of creditors, other than himself.
"Fraud in the inducement is defined as a `misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken.'" Bourdon's, Inc. v. Ecin Indus., 704 A.2d 747, 753 (R.I. 1997). (citing Black's Law Dictionary 661 (6th ed. 1990)). To prevail on a claim of fraud in the inducement, a party must prove four elements:
 "1. A false representation . . .
 2. Knowledge of the statements falsity . . .
 3. Intent to induce reliance . . .; [and]
 4. [D]etrimental reliance." Women's Dev. Corp. v. City of Cent. Falls, 764 A.2d 151,161 (R.I. 2001).
 Reliance
Assuming arguendo, without the present need to decide that the court was satisfied that disputed facts existed as to what Gordon and or Jacobs told Weiss with respect to the funding of EMIG, there can be no question but that our case law requires a finding of detrimental reliance in order for Plaintiff to make out a prima facie case of fraud in the inducement as pleaded in Counts II and/or III. Reasonable reliance is an objective standard and therefore capable of determination on a motion for summary judgment. Although Defendants claim never to have made the alleged misrepresentations, for the purposes of this argument, Defendants contend that as a matter of law Plaintiff could not have reasonably relied on these alleged misrepresentations. Specifically, Defendants claim that Plaintiff was a sophisticated businessman who, because of his experience, cannot rely on the representations of others. Furthermore, Defendants contend that the alleged representations were both declarations of future intentions and in direct conflict with the final agreement, neither of which could serve as a reasonable basis for reliance.
Reasonable reliance is measured objectively, yet consideration is given to certain subjective attributes of the individual, such as his or her sophistication. "[O]ne who has special knowledge, experience and competence may not be permitted to rely on statements for which the ordinary man might recover, and that one who has acquired expert knowledge concerning the matter dealt with may be required to form his own judgment, rather than take the word of the defendant." W. Page Keeton, Prosser and Keetonon Torts § 108, at 751 (5th ed. 1984).
Plaintiff Weiss has developed real estate in Rhode Island for the last 28 years. (Weiss Dep. at 14). He has acquired and renovated numerous commercial and residential buildings, one of which was a 350-unit apartment complex in New Orleans. Id. at 38. After two years of renovation, this complex was sold at a profit of at least $1,000,000. Id. at 38. In addition to his practical experience, Weiss has also enjoyed much academic success. Weiss graduated from Hunter College, received two Masters degrees from the University of Michigan, and was awarded a fellowship at Brown University.
Weiss is not only an experienced and well-educated businessman in the area of real estate, but he also is well aware of the use of single purpose entities and personal guaranties. In fact, some time in the 1980s a partnership, consisting of Weiss and two other investors, purchased a well-known apartment complex called the University Heights apartment complex in Providence. Id. at 31. University Heights Associates was established for the sole purpose of purchasing the apartment complex, managing its rehabilitation and preparing for its eventual sale; University Heights Associates was a single purpose entity. Furthermore, Weiss was required to personally guarantee financing for this project which he understood to mean "if we had problems, me personally, the bank could look to me for recourse." Id. at 37.
At the time Weiss entered the lease agreement with Gordon and Jacobs, Weiss admitted that he was familiar with the function of and implications of dealing with a limited liability company.Id. at 146-148. Furthermore, Weiss knew that neither Jacobs nor Gordon would personally guarantee the lease agreement, despite the request of Weiss's attorneys. Id. at 111 and 147. Weiss's deposition testimony clearly indicates that Weiss could not have reasonably relied on the assurances allegedly made by Jacobs and Gordon. Weiss had accumulated a wealth of knowledge and experience relating to both real estate and business entity forms so that he, a sophisticated businessman, is "required to form his own judgment, rather than take the word of the defendant." Illustrative of that point, is the fact that Weiss negotiated with Gordon and Jacobs to include in language which also limited his liability under the agreement.
Based on Plaintiff's sophistication, as a matter of law, he could not have reasonably relied on the alleged misrepresentations.
Defendants in this case also assert that "the clear and unambiguous language of the Limitations of Liability clause prevents Weiss from claiming that he believed the Defendants would be liable under the lease . . . especially . . . in light of Weiss's admission that the Defendants were not guaranteeing the lease and would not be personally liable." (Defendants' Memo at 13). It is well-settled that Plaintiff may not justifiably rely on an oral assertion directly in conflict with a contractual provision. LaFazia v. Howe, 575 A.2d 182, 185 (R.I. 1990). InLaFazia, the court affirmed summary judgment, finding that the disclaimer and merger provisions of the contract were clear, unambiguous, and therefore, binding on all parties. Id. Not only did the court defer to the language of the contract because of its specificity, but the court also considered the fact that the Plaintiff was represented by counsel and admitted to reading and understanding the contract. Accordingly, the LaFazia Court granted Defendant's motion for summary judgment because "defendants' asserted reliance on the oral representations of plaintiffs is not justifiable."
This Court finds that the language of the contract is clear and unambiguous as to the limited liability of EMIG. Furthermore, the contract does not bind either Jacobs or Gordon personally, designating the tenant as EMIG alone. Most importantly, however, both the issue of liability and guarantees were specifically discussed by all parties and after extensive negotiation, whereby each party, represented and advised by counsel, agreed to the contract. Therefore, this Court finds that the contract precludes Plaintiff from reasonably relying on any assurances allegedly made by Gordon and Jacobs prior to the execution of the contract.
Defendants also rely on St. Paul Fire and Insurance Co. v.Russo Bros., Inc., 641 A.2d 1297, 1299 n. 2 (R.I. 1994), for the proposition that a claim of misrepresentation may not be based on declarations of future intentions. Defendants stress the finding that "[a]n assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events." Id.
(citing Restatement (Second) Contracts § 159 comment c at 428 (1981)). In this case, many of the alleged misrepresentations made by Defendants were in fact promises of future acts.
For all of the foregoing reasons, the fourth element of fraud in the inducement has not been satisfied. Accordingly, summary judgment shall enter for Defendants on Counts II and III.
 Breach of Contract against EMI — Alter Ego Theory
"To impose liability on a corporation for the acts of its employees, the facts of a particular case must `render it unjust and inequitable to consider the subject corporation a separate entity' such as `when the corporate entity is used to defeat a public convenience, justify a wrong, protect fraud or defend crime * * *.'" Heflin v. Koszela 774 A.2d 25, 30 (R.I. 2001) (quoting R B Electric Co. v. Amco Construction Co.,471 A.2d 1351, 1354 (R.I. 1994)). This Court must determine whether Defendants purposefully utilized numerous limited liability companies for the purpose of defeating its creditors.
"To invoke the equitable alter ego doctrine, there must be a concurrence of two circumstances: (1) there must be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." Heflin at 30. (citing Transamerica CashReserve, Inc. v. Dixie Power and Water, Inc., 789 P.2d 24, 26 (Utah 1990)). The Heflin Court reversed the hearing justice's grant of summary judgment, finding that a genuine issue of material fact existed as to whether a propane business was in fact the alter ego of a separately incorporated lumber and hardware company. Id. Several facts which influenced the court's decision closely resemble those present in this case. Specifically, the court looked to the fact that both businesses shared an address, office space, and telephone number. Id. Of further import to the court was the fact that a secretary performed administrative and clerical tasks for both companies.Id.
In this case, these same facts are present: Gordon revealed in his deposition that EMI and EMIG shared a telephone number, address, email, internet site, and letterhead. (Gordon Dep. at 51-52.) Furthermore, all administrative functions for both companies were handled by EMI employees. (Donegan Dep. at 14-15.) Therefore, it remains unclear whether each corporation has been appropriately maintained as a distinct and independent entity.Id.
In Nat'l Hotel Assocs. v. O. Ahlborg Sons, Inc.,827 A.2d 646, 652 (R.I. 2003), the court also articulated the standard for piercing the corporate veil, stating the following:
 "if two corporations are affiliated through common stock ownership, each will be considered a separate and independent entity `unless the totality of the circumstances surrounding their relationship indicates that one of the corporations is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of [the other].' The criteria for piercing the corporate veil to impose liability on noncorporate defendants vary with the particular circumstances of each case. However, `when the facts of a particular case render it unjust and inequitable to consider the subject corporation a separate entity' we will not hesitate to disregard the corporate form and treat the defendant as an individual who is personally liable for the debts of the disregarded corporation. Thus, in circumstances in which there is such a unity of interest and ownership between the corporation and its owner or parent corporation such that their separate identities and personalities no longer exist we have held that `adherence to the principle of their separate existence would, under the circumstances, result in injustice.' In those situations the corporate form is disregarded and liability is determined by justice and fairness. Id. (citations omitted).
In the instant case, Defendants' reliance on the fact that individual records were maintained for each company is misplaced. Although courts should be mindful of this fact as evidence of the independent nature of each corporation, it is well-settled that courts must look to "the totality of the circumstances" to determine whether the entity used these devices to appear independent yet remain a mere "instrumentality, agency, conduit or adjunct of the other." Id. In National, the court found that one defendant corporation was, in fact, the alter ego of its affiliate. The court found "although defendants scrupulously adhered to the usual corporate formalities, thus endeavoring to preserve the corporate protections afforded by law, CSI wound up an empty shell, unable to pay this judgment because its assets were dissipated for the benefit of Richard and O. Ahlborg." Id.
at 653. Strict reliance on a corporation's adherence to certain formalities is, therefore, not dispositive. Accordingly, issues of material fact remain making Summary Judgment inappropriate on this count.
 Fraudulent Transfer
In the instant matter, Plaintiff alleges that EMIG transferred $30,000 to EMI in order to thwart any attempt to recover damages for its breach. Defendants moved for summary judgment on this count yet failed to argue the motion in their supporting memoranda. Nevertheless, the motion for summary judgment as to Count IV is denied for the following substantive reasons.
A fraudulent transfer as to present creditors is defined under Rhode Island's Uniform Fraudulent Transfer Act as
 "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." R.I. Gen. Laws 1956 § 6-16-5(b) (2002).
In this case, there is no question that SWA had a claim against EMIG; in fact, this Court granted SWA's motion for summary judgment on Count I, breach of contract, immediately following oral arguments on September 4, 2003.[1] This motion was unopposed; Defendants did not assert any defense.
The uncontested facts are as follows. SWA was collecting monthly rental payments for all three buildings pursuant to a 99-year lease agreement. SWA had collected three rental payments. (See page 5 Supra). The next payment was due February 1, 2002; EMIG did not make this or any further payments. Id. (Seealso, Plaintiff's Exhibit 20). On January 24, 2002, EMIG issued three checks totaling $30,000 in favor of EMI, an insider[2], each constituting transfers made after SWA's claim arose; namely, after the lease agreement was signed. (Plaintiff's exhibit 57). It is clear that this transfer was made to EMI with the knowledge that EMIG would be unable to make the rental payment due seven days later.
However, several facts material to this claim are disputed. For example, in explanation of the transfers, Ms. Donegan testified in her deposition that the checks were "for labor charges that had not been officially invoiced to Grace Park . . . [because] they wanted to make sure the cash was available to pay our obligations because there was discussion that the account might be frozen. . . ." (Donegan Dep. at 82). Additionally, Jacobs explains that these checks were issued after the third rental installment was paid to SWA in order to serve as payment for a retainer held by EMI "to cover what we believed to be the expenditures involved in winding up the obligations of EMI Grace Park Hotel. (Jacobs Dep. 317-318). As this determination requires this Court to make factual findings, summary judgment is inappropriate.
 CONCLUSION
Summary judgment will be granted when this Court finds that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, this Court finds summary judgment should be granted as to Counts II and III alleging fraud in the inducement because the evidence presented establishes as a matter of law that Plaintiff could not have reasonably relied on any of the alleged misrepresentations. Count V, Breach of Contract under the alter ego theory, is denied because there is a genuine issue of material fact as to whether the corporation followed corporate formalities sufficient to warrant protection of the corporate form. Finally, Count IV, Fraudulent Transfer, is denied because there is a genuine issue of material fact as to whether the transfers were made in consideration of services rendered by other companies.
Order to enter.
[1] Although no Order was entered to memorialize this decision, this Court relies on its decision as read and recorded in the record on September 4, 2003.
[2] Rhode Island General Laws defines an insider to be a "person in control of the debtor" corporation, where a person may be defined as "an individual, partnership, corporation, association, organization, government or governmental subdivision or agency, business trust, estate, trust, or any other legal or commercial entity." R.I. Gen. Laws 1956 § 6-16-1(7)(ii)(C) (2002); § 6-16-1(9).